**Mrs. Thomas P. BAUGHMAN, Appellant,**

v.

**Edward J. DERWINSKI, Secretary of Veterans Affairs, Appellee.**

No. 90–735.

United States Court of Veterans Appeals.

Argued Oct. 23, 1991.

Decided Nov. 13, 1991.

As Amended Nov. 18, 1991.

Lawrence B. Hagel, with whom Robert L. Nelson, Washington, D.C., was on the brief, for appellant.

John D. Lindsay, Jr., with whom Robert E. Coy, Acting Gen. Counsel, Barry M. Tapp, Asst. Gen. Counsel, and Andrew J. Mullen, Deputy Asst. Gen. Counsel, Washington, D.C., were on the brief, for appellee.

Before NEBEKER, Chief Judge, and FARLEY and IVERS, Associate Judges.

FARLEY, Associate Judge:

Appellant, Mrs. Thomas P. Baughman, seeks reversal of an April 5, 1990, decision by the Board of Veterans' Appeals (Board or BVA) denying service connection for her late husband's arteriosclerotic cardiovascular and peripheral vascular disease, as well as a resulting right above-the-knee amputation. The Court concludes that the July 23, 1986, rating decision, as a matter of law, granted service connection for the veteran's ischemic heart disease. For that reason, both the rating board, in its December 6, 1988, rating decision, and the BVA, in its April 5, 1990, decision erred when they denied service connection for the consequences of the ischemic heart disease, including arteriosclerotic cardiovascular and peripheral vascular disease and the resulting above-the-knee amputation. Nor did the BVA decision effectively sever the finding of service connection because it failed to afford appellant the procedural safeguards or meet the burden of proof imposed by 38 C.F.R. § 3.105(d). For these reasons, the April 5, 1990, BVA decision is reversed and the matter remanded for fur-

ther proceedings consistent with this opinion.

### I.

The veteran, Thomas P. Baughman, was inducted into the service on April 12, 1943. R. at 92, 107. He was hospitalized from May 9, 1943, until June 28, 1943, after suffering an acute exacerbation of a preexisting rheumatic heart condition and was eventually found unfit for duty and was honorably discharged on July 7, 1943. R. at 11, 44. On October 7, 1943, the veteran received a ten-percent disability rating for in-service aggravation of rheumatic heart disease. R. at 64. This rating was "confirmed and continued" in an October 24, 1951, rating decision: "Although minimal findings of cardiac disease are now demonstrable, rheumatic heart disease is present and the positive pathology will probably increase in severity over the years. The present 10% disability evaluation is confirmed and continued, no reexamination required." R. at 91.

On July 23, 1986, a rating board increased the veteran's disability rating from ten percent to thirty percent. R. at 92. In doing so, the rating board found that a "[c]urrent examination shows diagnosis of rheumatic heart disease, historical, not found; however, the veteran does have diagnosis of a [sic] ischemic heart disease with old inferior infarction." *Id.* The rating board concluded:

> The examiner states there are no findings of rheumatic heart disease; there is sufficient evidence of cardiac damage in service diagnosed as being due to rheumatic heart disease. Resolving reasonable doubt in favor of the veteran, the symptoms related to the current ischemic heart disease must be considered in the evaluation of rheumatic heart disease. Increased evaluation is conceded.

*Id.*

On February 22, 1988, the veteran was admitted to the Department of Veterans Affairs (VA) Medical Center in Temple, Texas, claiming to have been experiencing right foot pain for the previous six weeks. R. at 102. His right leg had become swollen and the fifth toe discolored prior to admission. *Id.* In addition, there was drainage from the toe, and "from between the fourth and fifth toes.... The right foot had evidence of ischemic changes with rubor and cyanosis when dependent.... There was no pulse detected...." *Id.* An angiogram performed on the leg "revealed no blood flow to the foot below the mid-calf." R. at 103. After unsuccessful attempts to save the veteran's leg, an above-the-knee amputation was performed on April 8, 1988. *Id.*

On June 17, 1988, based upon a review of the veteran's medical records, the rating board continued the thirty-percent rating. R. at 104. On October 28, 1988, the veteran noted his disagreement with the denial of increased compensation. "I have circulatory problems which are the result of rheumatic heart disease and my right leg has been amputated above the knee." R. at 106. As a result of the veteran's disagreement, the rating board reconsidered and on December 6, 1988, the board affirmed the thirty-percent disability rating for rheumatic heart disease but denied service connection for arteriosclerotic cardiovascular disease, peripheral vascular disease, and the right above-the-knee amputation. R. at 107. The rating board found that "[e]vidence of record does not show any recognized etiological relationship between SC rheumatic heart disease and the later developing arteriosclerotic cardiovascular and peripheral vascular disease.... There is no reported relationship [of the amputation] to the SC rheumatic heart disease." *Id.*

This position was upheld by the BVA in its decision of April 5, 1990. The Board recognized that the rating board specifically considered the veteran's "symptoms related to the current ischemic heart disease" when it increased the veteran's rating for rheumatic heart disease to thirty percent in 1986. *Thomas P. Baughman*, BVA 90–08108, at 4 (Apr. 5, 1990). However, the Board dismissed this consideration in a summary fashion:

> This was the judgment of the rating board in 1986 and we have no comment

as to the wisdom of this characterization or of the propriety of the rating symptoms of arteriosclerotic cardiovascular disease as if a rheumatic heart disease was not at issue. *In any event, this rating action fell short of establishing service connection for arteriosclerotic cardiovascular disease and that is the issue before us.*

*Baughman,* BVA 90–08108, at 5 (emphasis added).

In its findings of facts, the BVA recognized that a cause and effect relationship existed between the arteriosclerotic cardiovascular disease, the peripheral vascular disease, and the amputation: "... arteriosclerotic cardiovascular and peripheral vascular disease resulting in a right above-the-knee amputation." *Baughman,* BVA 90–08108, at 5. In addition, at oral argument, counsel for the Secretary agreed that the ischemic heart disease, which prompted the 1986 rating increase, is causally related to, if not indeed identical to, the arteriosclerotic cardiovascular disease which, in turn, led to the peripheral vascular disease and ultimately to the amputation.

Appellant argues that the 1986 rating did, in fact and in law, grant service connection for the ischemic heart disease and that it necessarily follows that service connection must also be granted for the consequent peripheral vascular disease and resulting amputation. While appellant recognizes that service connection can be withdrawn, it is argued that such a withdrawal can only be effected after the Secretary has complied with procedural requirements and met the stringent burden of proof created by 38 C.F.R. § 3.105(d). It is the Secretary's view that "the 1986 Rating Decision fell short of granting service connection for the newly developed condition." Br. at 14. Properly framed, therefore, the issue before the Court is whether the rating board granted service connection for the ischemic heart disease in 1986 when it considered the symptoms of that disease and increased the veteran's rating from ten to thirty percent.

## II.

The entitlement of a wartime veteran to compensation derives from 38 U.S.C. § 1110 (formerly § 310):

For disability resulting from personal injury suffered or disease contracted in line of duty, or for aggravation of a preexisting injury suffered or disease contracted in line of duty, in the active military, naval, or air service, during a period of war, the United States will pay to any veteran thus disabled ... from the period of service in which said injury or disease was incurred, or preexisting injury or disease was aggravated, compensation as provided in this subchapter....

*Id.* This statute provides the Secretary of Veterans Affairs, who is "responsible for the proper execution and administration of all laws administered by the Veterans' Administration" (38 U.S.C. § 303 (1991) (formerly § 210(b)(1))), with the authority to pay compensation. At the same time, this same statute limits the Secretary's authority in that it permits compensation only for disabilities which are service-connected. 38 U.S.C. § 1110 does not authorize payment for anything other than service-connected disorders. Neither the Secretary nor the BVA has provided this Court with any relevant statutory or regulatory provisions which would authorize the VA to pay compensation for non-service-connected disorders.

Pursuant to 38 C.F.R. § 4.101 (1991), service connection may be granted for sequelae of rheumatic heart disease which appear "some years later" than the initial symptoms of the disease:

[S]ervice connection may be given for an acute rheumatic fever and any cardiac residuals.... With a history of rheumatic fever in service, an aortic insufficiency manifest some years later without other cause shown may be service connected. The subsequent progress of rheumatic heart disease, and the effect of superimposed arteriosclerotic or hypertensive changes cannot usually be satisfactorily disassociated or separated so

as to permit differential service connection.

*Id.* (1991).

Once service connection has been granted, 38 C.F.R. § 3.105(d) (1991) provides that it can be withdrawn, but only after certain procedural safeguards have been complied with and the Secretary overcomes a high burden of proof:

> [S]ervice connection will be severed only where evidence establishes that it is *clearly and unmistakably erroneous* (the burden of proof being upon the Government).... A change in diagnosis may be accepted as a basis for severance action if the examining physician or physicians or other proper medical authority certifies that, in the light of all accumulated evidence, the diagnosis on which service connection was predicated is clearly erroneous. This certification must be accompanied by a summary of the facts, findings, and reasons supporting the conclusion.

(Emphasis added). In effect, § 3.105(d) places at least as high a burden of proof on the VA when it seeks to sever service connection as § 3.105(a) places upon an appellant seeking to have an unfavorable previous determination overturned. *See Oppenheimer v. Derwinski*, 1 Vet.App. 370, 372 (1991). *See also Thompson v. Derwinski*, 1 Vet.App. 251 (1991).

### III.

Applying the governing law to the facts of this case, it is the conclusion of the Court that when the rating board increased the veteran's rating for his rheumatic heart disease in 1986 on the basis of "the symptoms related to the current ischemic heart disease" as a matter of law it granted service connection for that disease. Therefore, we hold that the BVA erred in its decision of April 5, 1990, conclusion of law that "[a]rteriosclerotic cardiovascular and peripheral vascular disease with a right above-the-knee amputation was not proximately due to or the result of service-connected rheumatic heart disease." *Baughman*, BVA 90–08108, at 5. We hold further that the Board did not, as a matter of law, sever the service connection estab-

lished by the rating decision of July 23, 1986, because it did not afford the veteran the procedural safeguards established by 38 C.F.R. § 3.105(d), and it did not meet the burden of proof placed "upon the Government" to demonstrate that the granting of service connection was "clearly and unmistakably erroneous." *Id.* Accordingly, the April 5, 1990, decision of the Board of Veterans' Appeals is REVERSED and this matter is REMANDED pursuant to 38 U.S.C. § 7252(a) (formerly § 4052(a)) for further proceedings consistent with this opinion.

*It is so Ordered.*