Arelious DANIELS, Appellant,

v.

Hershel W. GOBER, Acting Secretary
of Veterans Affairs, Appellee.

No. 96–510.

United States Court of Veterans Appeals.

Nov. 3, 1997.

James C. McKay, Washington, DC, was on the brief for appellant.

Mary Lou Keener, General Counsel; Ron Garvin, Assistant General Counsel; and R. Randall Campbell, Deputy Assistant General Counsel, Washington, DC, were on the brief for appellee.

Before KRAMER, FARLEY, and HOLDAWAY, Judges.

FARLEY, Judge, filed the opinion of the Court. KRAMER, Judge, filed a concurring opinion.

FARLEY, Judge:

This is an appeal from a March 21, 1996, decision of the Board of Veterans' Appeals (BVA or Board) which found that a March 1957 rating decision severing the veteran's award of service connection for a psychiatric disorder was not the product of clear and unmistakable error (CUE), but granted the veteran's claim for service connection for his psychiatric disorder based upon new and ma-terial evidence. The only issue on appeal is the Board's determination that the 1957 rating decision did not contain CUE. This appeal is timely and the Court has jurisdiction pursuant to 38 U.S.C. § 7252(a). For the reasons that follow, the Court will affirm the decision of the Board.

## I.

The appellant, Arelious Daniels, served on active duty from June 1942 to October 1943. Record (R.) at 75. His induction physical examination did not note the presence or any history of any psychiatric conditions. R. at 61–64. In July 1943 the veteran was sent to the Disciplinary Training Center after an incident in which he was insubordinate to an officer. See R. at 50, 57. At that time, another soldier reported that the veteran had twice been admitted to a state mental facility prior to service and that he had attacked members of his family and others with a knife. R. at 50. He was referred for medical evaluation of his mental condition. R. at 50–52, 58. A hospital report dated July 26, 1943, stated that the veteran had corroborated the information related by his fellow soldier that he had been admitted to a mental facility twice before service. R. at 50. It was recommended that the veteran be returned to the United States through medical channels for a medical discharge. R. at 56, 59. On August 16, 1943, the veteran was admitted to Halloran General Hospital in Staten Island, New York, for observation for mental deficiency with psychosis. R. at 22. On August 24, 1943, he was transferred to McCloskey General Hospital in Temple, Texas, where he was diagnosed with "psychosis with mental deficiency." R. at 21. By letter dated September 13, 1943, the Arkansas State Hospital confirmed that the veteran had been admitted to that facility on July 7, 1933, and paroled on August 3, 1933; admitted again October 24, 1933, and paroled on December 2, 1934; readmitted on January 21, 1936, escaped on November 2, 1936, returned on November 3, 1936, and paroled on November 22, 1936; and readmitted on December 6, 1936, and escaped on March 14, 1938. R. at 19. The letter also stated that on Mr. Daniels' last two admissions, he was diagnosed with a depressed type of manic-

depressive psychosis. *Id.* The hospital's last note relating to Mr. Daniels dated February 23, 1933, stated that, "[w]ith the exception of a decrease in his psychomotor activity, there has been no mental symptom in several months. I would agree to his parole." *Id.* The veteran was medically discharged from the Army in October 1943 because of "mental disease." R. at 66–68. Based upon the reports that the veteran had been admitted to a mental hospital prior to service, the board of medical officers determined that the veteran's condition had existed prior to service. R. at 67. The board of medical officers also determined that the veteran's condition was not aggravated by service. R. at 68.

On December 16, 1943, the rating board found that the veteran's psychiatric condition was aggravated by service and awarded him service connection, rated at 10% disabling. R. at 81. In March 1947 the regional office (RO) proposed reducing the veteran's disability rating to noncompensable as of May 1947, based upon a January 1947 examination. R. at 99. The veteran's rating was reduced to noncompensable as of May 1947. R. at 108.

The veteran was admitted to the VA hospital in Fort Cluster, Michigan, on March 24, 1949, and diagnosed with "[s]chizophrenic reaction, hebephrenic type, chronic, moderate." R. at 115. In April 1949, while the veteran was still hospitalized, the veteran's disability rating was increased to 100%, effective on the date of his admission. R. at 118. That rating was confirmed and continued on May 31, 1949. R. at 132. The veteran was discharged from the VA hospital on May 24, 1950, with a diagnosis of "[s]chizophrenic reaction, hebephrenic type, chronic, moderate (improved)." R. at 137. His discharge summary listed "military service" as an "[e]xternal precipitating stress" and a "minimal to moderate" degree of impairment. *Id.* The summary further stated that:

> The description of the external precipitating stress, predisposing factors[,] and the adjective description of the estimated resultant incapacity recorded in this examination are for fuller psychiatric study and treatment purposes. They are not determinative as a basis for compensation or pension purposes. The adjudicating agencies are responsible for the evaluation of all evidence available in determining entitlement to compensation or pension.

R. at 138. In a June 1950 rating decision the RO found that, based upon the discharge summary, the veteran was competent as of May 24, 1950, the date he was discharged from the hospital. R. at 141. The RO continued the veteran's 100% rating, but on September 29, 1950, proposed a reduction to 70% based upon a September 1950 disability examination. R. at 155; *see also* R. at 146–53. The veteran was examined by VA again on October 12, 1951. R. at 157–61. The examiner's diagnosis was "[s]chizophrenia, mixed catatonic, hebephrenic in fair to good remission." R. at 160. On October 30, 1951, based upon the October 12 examination, the regional office found that there was "no logical reason ... why the veteran should not resume working," that the veteran's occupational and social handicaps were "fair," that he was competent, and that his disability was in "fair remission." R. at 163. The RO, therefore, reduced the veteran's disability rating to 70% from December 12, 1950, to December 29, 1951, and to 30% effective as of December 30, 1951. R. at 164.

In an October 21, 1953, medical examination for disability evaluation the veteran was again diagnosed with schizophrenia "in fairly good remission," and was found to be competent. R. at 166–72. A rating decision dated November 27, 1953, noted that the veteran was employed full time and that his disability was in good remission. R. at 174. The rating board found that "[i]n view of the marked improvement in the veteran's disability, as evidenced by his ability to adjust to employment and society" and the fact that his disability was in "good remission," a reduction in his disability rating to 10% effective January 27, 1954, was warranted. *Id.*

The veteran was hospitalized in December 1956 because of "aggressive and paranoid behavior" (R. at 179–84, 186), and was considered incompetent (R. at 181). He was declared incompetent as of December 12, 1956, by the RO in March 1957. R. at 191. A request for the appointment of a custodian or guardian was completed in March 1957. R. at 193. The form indicates that the VA Hospital, Battle Creek, Michigan, was the

"person having custody of ... [the] incompetent," and identified the American Legion as the "agency prosecuting claim or corresponding in behalf of ... [the] incompetent." *Id.*

In the March 1957 rating decision the rating board also found that the December 1943 rating decision originally granting the veteran service connection for the veteran's "mental deficiency," and all subsequent rating decisions continuing service connection under different nomenclature, including schizophrenia, involved clear and unmistakable error. R. at 189–91. The rating board found that it was "inescapable that the veteran's mental condition existed prior to service without aggravation therein," and that the veteran's episodes in service were merely recurrent manifestations of his preexisting condition. *Id.* The rating board proposed severing service connection. *Id.* In August 1957 the Chief Benefits Director concurred in the proposal to sever service connection. R. at 195.

In November 1957 the RO severed the veteran's service connection for mental deficiency. R. at 201. Notification of this action was sent to the manager of the VA hospital, the veteran's contact representative, and to the American Legion, the veteran's service representative. *See* R. at 199, 203. In response, the contact representative from the VA hospital acknowledged the severance of the veteran's service connection and requested that he be considered for a non-service-connected pension. R. at 203, 214. The veteran was awarded a non-service-connected pension in February 1958. R. at 217, 219–20.

In December 1991, the veteran attempted to reopen his claim for service connection for his "nervous condition." R. at 262–65. By rating decision dated May 13, 1992, the RO found that the veteran had not submitted new and material evidence to reopen his claim for service connection for his mental condition. R. at 297–98. The veteran filed a Notice of Disagreement on July 27, 1992, in which he raised the following questions:

If my psychiatric disorder existed prior to service, why was it not evaluated by the military before I was sent overseas? and not until approximately 14 months after I entered active duty?

R. at 304. The veteran also asked what written evidence the decision was based upon. *Id.* In October 1992, the veteran's representative submitted a statement on behalf of the veteran claiming that his psychiatric condition was aggravated by service. R. at 307. The RO issued a confirmed rating decision in November 1992, finding that new and material evidence had not been submitted to reopen the veteran's claim. R. at 312–13.

The veteran testified at a hearing before the RO on March 17, 1993. R. at 342–56. He admitted that his nervous condition had existed prior to service, but stated that he was fine when he had entered service. R. at 342–43. The veteran also testified that the report from his fellow soldier while he was in service was not true. R. at 343. The soldier had reported that the veteran had been admitted to a mental facility prior to service because he had attacked members of his family with a knife. *See* R. at 50. The veteran's sister testified that the veteran had never threatened her or their parents with a knife. *Id.* The veteran's sister also testified that the veteran had had psychiatric problems in his youth. R. at 345–46. Later in the hearing, the veteran testified that he did not have any problems before service, that he had been hospitalized, but that he did not know why he had been hospitalized. R. at 349. The hearing officer affirmed the May 13, 1992, and November 12, 1992, rating decisions finding that new and material evidence had not been submitted to reopen the veteran's claim and found that the November 25, 1957, rating decision severing service connection "was correct." R. at 405.

In July 1993 the veteran's sister, Reva Salter, submitted a statement that her brother's mental condition had gotten worse after he had served in the Army. R. at 412. In his appeal to the BVA the veteran raised an issue as to the credibility of the statement of the veteran's fellow soldier relied upon in the March 1957 proposal to sever service connection. R. at 415. On September 3, 1993, the RO issued a rating decision finding that (1) new and material evidence had been submitted to reopen the veteran's claim, but that the evidence was not sufficient to establish service connection, and (2) "[s]everance of service connection for the nervous condition was correct." R. at 428–30.

On appeal of the September 1993 decision, the veteran's representative argued again that the veteran's condition was aggravated by service, the representative also noted that a determination as to whether the veteran had had combat participation had never been made. R. at 439–40. On October 23, 1995, the Board referred the veteran's case for a medical expert opinion. R. at 442–43. The question presented to the expert was: "Does the evidence of record show that the veteran's psychiatric symptomatology demonstrated during active service represent a permanent increase in his underlying psychiatric disease, beyond its natural progress?" R. at 442. The expert's response was as follows:

[I]t is almost impossible to render a definitive opinion regarding the effect of the appellant's service experience on the natural course of his pre-existing problems. However, one can present a rather compelling argument that the induction of a mentally retarded youngster into service, separating him from his familiar environment, [and] sending him abroad during war time, constitutes a stress level above and beyond the coping ability of such an individual. If one even partially accepts the above argument than one can opine with a reasonable degree of confidence that the appellant's condition was aggravated during the course of his military service and in all likelihood the natural course of his illness was at least minimally altered.

R. at 446. In the March 21, 1996, decision here on appeal the Board found that the veteran had established in his reopened claim that his psychiatric disorder was aggravated by service, but that the November 1957 decision severing service connection was final and was not a product of CUE. R. at 7–17. The veteran appeals the Board's determination that the November 1957 decision did not contain CUE, and argues alternatively that the 1957 decision never became final because, although his custodian was notified of the decision, he did not appeal or take any action to protect the interests of the incompetent veteran.

## II.

When a claim is denied as a result of "initial review or determination," and the claimant fails to timely appeal that decision by filing a Notice of Disagreement within the one-year period prescribed in 38 U.S.C. § 7105(b)(1), that decision becomes final and the claim may not "thereafter be reopened or allowed, except as may otherwise be provided by regulations not inconsistent with" title 38 of the United States Code. 38 U.S.C. § 7105(c); see also Person v. Brown, 5 Vet. App. 449, 450 (1993) (failure to timely appeal RO decision within one-year period renders decision final). "Previous determinations which are final and binding ... will be accepted as correct in the absence of clear and unmistakable error." 38 C.F.R. § 3.105(a) (1996).

■ To establish a valid CUE claim a claimant must show that "[e]ither the correct facts, as they were known at the time, were not before the adjudicator or the statutory or regulatory provisions extant at the time were incorrectly applied." Russell v. Principi, 3 Vet.App. 310, 313 (1992) (en banc). The appellant cannot merely disagree with the way the facts were weighed or evaluated. Id. "CUE is a very specific and rare kind of 'error.' It is the kind of error, of fact or law, that when called to the attention of the reviewers compels the conclusion, to which reasonable minds could not differ, that the result would have been manifestly different but for the error." Fugo v. Brown, 6 Vet. App. 40, 43 (1993). Review of a BVA decision on the existence of CUE in a final RO adjudication is limited to whether the BVA decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law...." 38 U.S.C. § 7261(a)(3)(A); Russell, 3 Vet.App. at 315.

Once service connection has been granted, it can be severed only upon the Secretary's showing that the rating decision granting service connection was clearly and unmistakably erroneous, and only after certain procedural safeguards have been met. 38 C.F.R. § 3.105(d) (formerly 38 C.F.R. § 2.1009); see also Graves v. Brown, 6 Vet.App. 166, 170–71 (1994). The Secretary's burden in severing service connection is the same as a claimant's burden in attempting to overturn a final decision on the basis of CUE. See Baughman v. Derwinski, 1 Vet.App. 563 (1991); see also Graves, supra (holding that CUE is defined

the same under 38 C.F.R. § 3.105(d) as it is under § 3.105(a)). In this case, therefore, the appellant must show that the Secretary's 1957 determination of CUE in the 1943 rating decision was itself the product of CUE. Although the Secretary had a very high burden to meet in his 1957 rating decision, the appellant now bears the high burden of establishing CUE in that decision.

The appellant argues that the errors in the March 1957 rating decision constituting CUE were (1) that there was no "substantial basis" for the RO's findings in 1957 that the appellant's psychosis existed prior to service and was not aggravated by service (Appellant's Brief (Br.) at 14–18); (2) that the rating Board made no specific finding that the veteran's "episodes in service" were due to the natural progress of his disease, as required by 38 U.S.C. § 2.1100, which was in effect in 1943 (Br. at 7, 18–20); and (3) that the RO and the BVA relied upon post-December 16, 1943, evidence in determining that the veteran's service connection should be severed as of November 25, 1957 (Br. at 20–21). The statutory and regulatory provisions extant in 1943 with respect to a claim of aggravation of an injury or disease in service were essentially the same as they are today. *Compare* Vet. Reg. No. 1(a), Part I, para. I(d), Ex. Ord. No. 6156 (June 6, 1933), *with* 38 U.S.C. § 1153; 38 C.F.R. § 3.306(a) (1996).

■ With respect to the appellant's first allegation of CUE, i.e., that there was no "substantial basis" for the RO's determination that the appellant's condition existed prior to, and was not aggravated by service, this is not a valid basis for a CUE claim. The appellant has not alleged that the correct facts, as they were known at the time, were not before the adjudicator, or that the statutory or regulatory provisions extant at the time were incorrectly applied. *Russell, supra.* The appellant's argument would require this Court to reevaluate the evidence considered in 1957 to decide if it provided a "substantial basis" for the decision; however, "simply to claim CUE on the basis that previous adjudications had improperly weighed and evaluated the evidence can never rise to the stringent definition of CUE." *Fugo,* 6 Vet.App. at 44.

■ The appellant also argues that, even if his psychiatric condition did preexist service, the RO failed to make a specific finding that the appellant's psychiatric troubles in service were due to the natural progress of his disease, as was required by the former 38 C.F.R. § 2.1100, which is now embodied in 38 C.F.R. § 3.306(a). The determination that a preexisting disability which increased in severity *was not aggravated* by service does require a finding that the increase in severity was due to the natural progress of the disease. 38 U.S.C. § 1153; *Browder v. Brown,* 5 Vet.App. 268, 270 (1993); *Stadin v. Brown,* 8 Vet.App. 280, 285 (1995). Where there is no increase in severity of the disability, however, the presumption of aggravation does not apply and no such specific finding need be made. *Id.; Hunt v. Derwinski,* 1 Vet.App. 292, 296 (1991). In its 1957 decision the rating board found that "[t]he episodes in service cannot be considered aggravation but were merely recurrent manifestations of his pre-service disability." R. at 190.

The appellant is correct that the RO did not make a specific finding that the appellant's psychiatric troubles while in service were not due to the natural progress of the disease. This omission, however, was not error because the RO found initially that the veteran's condition did not increase in severity during service. *See Hunt,* 1 Vet.App. at 297 ("[I]ntermittent flair-ups during service of a preexisting injury or disease are not sufficient to be considered 'aggravation in service' unless the underlying condition ... is worsened."). In the decision here on appeal, the BVA found that the evidence of record supported the RO's conclusion that the underlying condition did not worsen in service. R. at 13. The Board's conclusion is also well supported by the record, and therefore, cannot be said to be arbitrary, capricious, or an abuse of discretion. *See, e.g.,* R. at 68 (The veteran's in-service treating physicians found that his condition was not aggravated by service.).

■ The appellant's final assertion of CUE must also fail. The appellant claims that it was error for the rating board in 1957, and the BVA in its 1996 decision, to consider

evidence which post-dated the 1943 decision initially granting the service connection. Br. at 20–21. The appellant is correct that a CUE determination must be based only upon the evidence of record at the time of the challenged decision. *Russell*, 3 Vet.App. at 314. A determination to sever service connection, however, is not similarly limited. *Venturella v. Gober*, 10 Vet.App. 340 (1997)(Steinberg, J., concurring). Although the same standards applied in a determination of CUE in a final decision are applied to a determination whether a decision granting service connection was the product of CUE for the purpose of severing service connection, § 3.105(d) does not limit the reviewable evidence to that which was before the RO in making its initial service connection award. In fact, § 3.105(d) specifically states that "[a] change in diagnosis may be accepted as a basis for severance," clearly contemplating the consideration of evidence acquired after the original granting of service connection. *See also* 38 U.S.C. § 5112(b)(6) (effective date of severance of service connection by reason of change in service-connected status shall be last day of month following 60 days from date of notice to payee of discontinuance). Thus, neither the RO nor the BVA erred in considering such evidence. "If the Court were to conclude that ... a service-connection award can be terminated pursuant to § 3.105(d) only on the basis of the law and record as it existed at the time of the award thereof, VA would be placed in the impossible situation of being forever bound to a prior determination regardless of changes in the law or later developments in the factual record." *Venturella, supra.*

██ Finally, the appellant argues, for the first time here on appeal, that the 1957 RO decision severing service connection never became final. The appellant bases his argument on his claim that his representative, an employee of the VA hospital, failed to appeal the decision on his behalf, or to take action to protect his interests. The appellant's characterization of the facts, however, is not entirely correct. The record reveals that the representative did take some action to protect the veteran's interests by applying for non-service-connected benefits on his behalf. R. at 214. To the extent the appellant attempts to raise error on the part of VA as

an alternate theory of CUE, this Court is without jurisdiction to consider that issue in the first instance. *Sondel v. Brown*, 6 Vet. App. 218, 220 (1994) (dismissing appellant's CUE claim where specific CUE raised was never raised before Board); *Russell, supra.* In addition, the BVA made a specific finding of fact that the 1957 decision was final, a determination which was supported by the record and thus, not "clearly erroneous." 38 U.S.C. § 7261(a)(4); *Gilbert v. Derwinski*, 1 Vet.App. 49, 52–53 (1990) (Court reviews factual findings of BVA under "clearly erroneous" standard of review). The appellant's argument, however, is more in the nature of equitable estoppel, i.e., VA cannot rely on the finality of a decision which it had a duty to further pursue. Even if a VA employee had failed in his fiduciary duty to the appellant, this Court is precluded from awarding benefits on the basis of equitable estoppel. *Shields v. Brown*, 8 Vet.App. 346, 351 (1995); *Owings v. Brown*, 8 Vet.App. 17, 23 (1995) (citing *OPM v. Richmond*, 496 U.S. 414, 426, 110 S.Ct. 2465, 2472, 110 L.Ed.2d 387 (1990)) ("judicial use of the doctrine of equitable estoppel cannot grant respondent a money remedy that Congress has not authorized"); *see also Suttmann v. Brown*, 5 Vet.App. 127 (1993) ("[A]uthority to award equitable relief ... is committed 'to the sole discretion of the Secretary' and ... the BVA and, consequently, this Court are without jurisdiction to review the Secretary's exercise of that discretion.") (quoting *Darrow v. Derwinski*, 2 Vet. App. 303, 305 (1992)). Consequently, the Court does not have the authority to declare the 1957 decision not final based upon a theory of equitable estoppel.

### III.

Upon consideration of the record and the briefs of the parties, the Court holds that the appellant has not demonstrated that the Board committed either factual or legal error which would warrant reversal or remand. *Gilbert, supra; see also Anderson v. City of Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); *Danville Plywood Corp. v. United States*, 899 F.2d 3 (Fed.Cir. 1990). The Court also is satisfied that the BVA decision meets the "reasons or bases" requirements of 38 U.S.C. § 7104(d)(1). *See*

*Gilbert, supra.* Accordingly, the March 21, 1996, decision of the Board of Veterans' Appeals is AFFIRMED.

KRAMER, Judge, concurring:

I fully agree with the majority decision and add this concurrence only to respond further to the appellant's factual averments. If one limits review of the evidence to that which existed at the time of the 1943 RO decision, none of it suggests that a permanent increase in disability occurred during military service. Furthermore, even if one were to look at the evidence added to the record between 1943 and 1957, it too does not suggest that a permanent increase in disability occurred during military service. In fact, the only evidence that addressed the impact of the appellant's service on his condition is the May 1950 VA hospital discharge summary. It, however, speaks not of a permanent increase in disability but only in terms of a stress factor on the appellant's then existing condition.