**This version includes the errata issued April 5, 2007-e**

**UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS**

No. 04-0449

JERRY G. ALLEN, APPELLANT,

AND

No. 04-1304

ANDREW J. KEY III, APPELLANT,

V.

R. JAMES NICHOLSON,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Decided      March 16, 2007    )

*Kenneth M. Carpenter,* of Washington, D.C., was on the pleading for the appellants.

*Tim McClain*, General Counsel; *R. Randall Campbell*, Assistant General Counsel; *Richard Mayerick,* Deputy Assistant General Counsel; and *Catherine A. Chase* and *Ralph G. Stiehm*, all of Washington, D.C., were on the pleading for the appellee.

Before GREENE, *Chief Judge*, and HAGEL and MOORMAN, *Judges.*

GREENE, *Chief Judge*: Appellants Jerry G. Allen and Andrew J. Key III, appeal, through counsel, January 29, 2004, and April 26, 2004, Board of Veterans' Appeals (Board) decisions, respectively, that determined that VA regional office (RO) decisions had properly severed their awards of VA benefits. *Allen* Record (R.) at 1-7; *Key* R. at 1-7. In each decision, the Board found that it was clear and unmistakable error (CUE) for the RO to have awarded VA benefits for disabilities arising from duty in quelling a state prison riot as members of the New Mexico Army National Guard (NMANG). On April 12, 2005, Allen's and Key's appeals were consolidated because both underlying Board decisions are based upon the same material facts and upon identical issues,

and both parties are represented by the same counsel.  For the reasons set forth below, the 2004 Board decisions will be affirmed.

## I. BACKGROUND

Allen and Key served in the NMANG from May 1978 to May 1985, and April 1979 to February 1980, respectively.  On February 2, 1980, and February 3, 1980, the Governor of New Mexico ordered Allen's and Key's Army National Guard units into the active military service of the state to quell a riot at the Santa Fe, New Mexico, state penitentiary.  Subsequently, they sought VA service-connected disability benefits on the basis that their participation in quelling that riot caused them to suffer post-traumatic stress disorder (PTSD).  In May 1999, the RO awarded Key service connection for PTSD on that basis, and assigned a 100% disability rating, effective May 11, 1992. He was also awarded VA dependents' educational assistance (DEA) benefits.  In March 2000, the RO awarded Allen service connection for PTSD, and assigned a 30% disability rating, effective from April 22, 1997, through June 28, 1999, and a 70% disability rating thereafter.  Allen was also awarded a rating of TDIU.

Soon thereafter, the inspector general of the NMANG advised the RO that several New Mexico Guardsmen should not have been awarded VA service connection for performing state National Guard duty for quelling the penitentiary riot, which was state duty.  In April 2001, the RO requested from the director of the VA Compensation and Pension (C&P) Service an advisory opinion on whether service by New Mexico Guardsmen in quelling the New Mexico prison riot qualified as active service for VA benefits purposes.  In response, the director opined: "Active military service of the State of New Mexico by a member of the New Mexico National Guard to control the Santa Fe, New Mexico, prison riot does not meet the definition of active duty in the Armed Forces of the United States as specified at 38 C.F.R. § 3.6(c)(3) [(2000)]." *Allen* R. at 276; *Key* R. at 81.  The director further advised that action should be taken to sever the VA benefits awarded to Allen and Key.

Allen and Key were notified of the RO's intention to sever their service connection for PTSD, and in January 2002 decisions, the RO recorded that an October 2000 letter from the Army National Guard stated that "New Mexico National Guard Soldiers were activated by the Governor to help quell inmate riots in a New Mexico prison and that they were activated under Title 32, U.S. [Code]

2

on state active duty." *Allen* R. at 281; *Key* R. at 89. Consequently, the RO found that because a determination of qualifying service for VA benefits had not been made at the time that benefits were awarded, the RO had committed CUE in awarding Allen and Key service connection and VA benefits. Accordingly, their awards of service connection were severed. Allen and Key appealed, and in January and April 2004 decisions, the Board affirmed the RO's decisions. The Board first found that "the RO satisfied all procedural requirements specified by regulation where severance of service connection is contemplated." *Allen* R. at 6; *Key* R. at 6. Next, the Board agreed with the RO and concluded that CUE had been committed in the RO decisions that awarded Allen and Key entitlement to VA benefits and stated:

> Following the . . . [RO] decision[s], information was received that the veteran[s'] service during the February 1980 prison riot was for the state of New Mexico rather than Federal service. Therefore, this is a new material fact, which was not before the RO at the time of the . . . [RO] decision[s] granting service connection . . . , and the RO's determination at that time constitutes error that is "undebatable" and of the sort "which, had it not been made, would have manifestly changed the outcome at the time is was made."

*Allen* R. at 7; *Key* R. at 7. This appeal followed.

## II. PARTIES' CONTENTIONS

Allen and Key argue that (1) the record does not contain clear and unmistakable evidence showing that their grants of service connection were CUE; (2) the Board failed to provide an adequate statement of reasons or bases because it failed to consider and apply 38 U.S.C. §§ 101(22)(C), (24)(b), 1131; (3) VA relied erroneously on 38 C.F.R. § 3.6(c)(3) (2000) to support its decision to sever service connection because that section makes no distinction between state and Federal duty for the purposes of veterans benefits; and (4) the Board erred in affirming the severance of service connection because it relied on the 2001 advisory opinion, which amounts to "a post hoc *re-weighing* of the facts and does not constitute clear and unmistakable evidence to support . . . VA's burden to sever an award of disability compensation." *Allen* Br. at 8-15; *Key* Br. at 7-15.

The Secretary argues for affirmance of the Board decisions because section 101(22)(c) and § 3.6(c)(3) "specifically limit[] active duty for training to duty which is performed under 32 U.S.C. §§ 316, 520, 503, 504, and 505, which pertain to *training* and clearly do not encompass an

3

emergency call-up order issued by a state governor to quell a prison riot." *Allen* Secretary's (Sec'y) Br. at 15; *see Key* Sec'y Br. at 11. The Secretary asserts that any purported errors in the Board's reasons or bases are harmless because, by law, the appellants are not entitled to veterans benefits. *Allen* Sec'y Br. at 16-19; *see Key* Sec'y Br. at 15-17.

## III. APPLICABLE LAW

### A.  Eligibility for VA Disability Compensation

When Allen and Key were awarded service connection for PTSD, the governing law describing basic entitlement to compensation for peacetime service-connected disability compensation provided:

> For disability resulting from personal injury suffered or disease contracted in line of duty, or for aggravation of a preexisting injury suffered or disease contracted in line of duty, in the active military, naval, or air service, during other than a period of war, the United States will *pay to any veteran* thus disabled . . . from the period of service in which said injury or disease was incurred, or preexisting injury or disease was aggravated, compensation as provided in this subchapter.

38 U.S.C. § 1131 (emphasis added); *see also* 38 U.S.C. §§ 1112, 1113(a); 38 C.F.R. §§ 3.303(a), 3.306 (1999 & 2000). Thus, in order to receive VA benefits, a claimant must be a "veteran." A "veteran" is defined, in part, as "a person who served in the active military, naval, or air service." 38 U.S.C. § 101(2); *see also* 38 C.F.R. § 3.1(d) (1999 & 2000). "[A]ctive military, naval, or air service" is defined to include

> active duty, any period of active duty for training during which the individual concerned was disabled or died from a disease or injury incurred or aggravated in line of duty, and any period of inactive duty training during which the individual concerned was disabled or died from an injury incurred or aggravated in the line of duty.

38 U.S.C. § 101(24); *see also* 38 C.F.R. § 3.6(a) (1999 & 2000).

"Active duty" is defined as, inter alia, "full-time duty in the Armed Forces, other than active duty for training." 38 U.S.C. § 101(21); *see* 38 C.F.R. § 3.6(b)(1). "Armed Forces" describes "the United States Army, Navy, Marine Corps, Air Force, and Coast Guard, including the reserve components thereof." 38 U.S.C. § 101(10). The reserve components include the Army National Guard of the United States. 38 U.S.C. § 101(29). However, the Army National Guard is only a

4

reserve component "while in the service of the United States." 10 U.S.C. § 10106. Section 12401 of title 10, U.S. Code, provides that "members of the Army National Guard of the United States and the Air National Guard of the United States are not in active Federal service except when ordered thereto under law." 10 U.S.C. § 12401. Thus, a member of the National Guard holds a status as a member of the federal military or the state militia, but never both at once. *See Perpich v. Department of Defense*, 496 U.S. 334 (1990) ("[National Guard members] now must keep three hats in their closets--a civilian hat, a state militia hat, and an army hat--only one of which is worn at any particular time."). In *Perpich*, the Supreme Court discussed the dual scheme of the state and federal National Guard systems and stated:

> Since 1933 all persons who have enlisted in a state National Guard unit have simultaneously enlisted in the National Guard of the United States. In the latter capacity they became a part of the Enlisted Reserve Corps of the Army, but unless and until ordered to active duty in the Army, they retain their status as members of a separate state Guard unit.

*Id*. at 345. The U.S. Court of Appeals for the Federal Circuit interpreted *Perpich* to stand for the proposition that "members of the National Guard only serve the federal military when they are formally called into the military service of the United States [and that a]t all other times, National Guard members serve solely as members of the State militia under the command of a state governor." *Clark v. United States*, 322 F.3d 1358, 1366 (Fed. Cir. 2003).

Additionally, "[a]ctive duty for training" for "members of the Army National Guard . . . of any State" is defined as "full-time duty under section 316, 502, 503, 504, or 505 of title 32." 38 U.S.C. § 101(22)(C). Section 3.6(c)(3) of title 38, Code of Federal Regulations defines "active duty for training" in the same manner. 38 C.F.R. § 3.6(c)(3). Similarly, "[i]nactive duty for training" in reference to "members of the Army National Guard . . . of any State" is defined as "duty (other than full-time duty) performed by a member of the National Guard in any State under 32 U.S.C. §§ 316, 502, 503, 504, or 505, or the prior corresponding provisions of law." 38 U.S.C. § 101(23); *see* 38 C.F.R. § 3.6(d)(4). Therefore, to have basic eligibility for veterans benefits based on a period of duty as a member of a state Army National Guard, a National Guardsman must have been ordered into Federal service by the President of the United States, *see* 10 U.S.C. § 12401, or must have performed "full-time duty" *under the provisions of 32 U.S.C. §§ 316, 502, 503, 504, or 505. See*

5

38 U.S.C. §§ 101(21), (22)(C) (emphasis added); *see also* 32 U.S.C. §§ 316 (providing for detailing of regular members of the U.S. Army and Air Force to duty with the Army or Air National Guard of each State); 502(a)(2) (stating that "each company, battery, squadron, and detachment of the National Guard . . . shall . . . participate in training at encampments, maneuvers, outdoor target practice, or other exercises, at least 15 days each year"); 503 (providing for participation in field exercises); 504 (dealing with National Guard Schools and small arms competitions); 505 (dealing with U.S. Army and Air Force schools and field exercises).

### B. CUE and Severance of Service Connection

"Review to determine whether clear and unmistakable error exists in a case may be instituted by the Secretary on the Secretary's own motion or upon request of the claimant." 38 U.S.C. § 5109A(c). "Previous determinations [by VA,] which are final and binding, . . . will be accepted as correct in the absence of [CUE]," and "service connection will be severed only where evidence establishes that it is clearly and unmistakably erroneous," except "where . . . *the evidence establishes that service connection was clearly illegal*." 38 C.F.R. 3.105 (2006) (emphasis added); *see Venturella v. Gober*, 10 Vet.App. 340, 342 (1997). When it is determined that there is no legal entitlement for a previous award of VA benefits, VA's authority to sever service connection is not limited to cases in which there is a finding of CUE. *Venturella*, *supra.* The Secretary has the burden of demonstrating that an award of service connection is clearly and unmistakably erroneous, *see Graves v. Brown*, 6 Vet.App. 166, 170 (1994), and his decision to sever service connection is subject to direct appellate review under 38 U.S.C. § 501(b).

For CUE to exist, either (1) the correct facts in the record were not before the adjudicator or (2) the statutory or regulatory provisions extant at the time were incorrectly applied. *See Damrel v. Brown*, 6 Vet.App. 242, 245 (1994). In addition, "the error must be 'undebatable' and of the sort 'which, had it not been made, would have manifestly changed the outcome at the time it was made.'" *Id.* (quoting *Russell v. Principi*, 3 Vet.App. 310, 313-14 (1992) (en banc)); *see Bustos v. West*, 179 F.3d 1378, 1380 (Fed. Cir. 1999) (expressly adopting "manifestly changed the outcome" language of *Russell*, *supra*). "In order for there to be a valid claim of [CUE], . . . [t]he claimant, in short, must assert more than a disagreement as to how the facts were weighed or evaluated." *Russell*, 3 Vet.App. at 313. That is because, "even where the premise of error is accepted, if it is not

absolutely clear that a different result would have ensued, the error complained of cannot be, ipso facto, clear and unmistakable." *Fugo v. Brown*, 6 Vet.App. 40, 43-44 (1993).

Determinations of CUE in general are based upon the record only as it existed at the time of the decision in question, *see Russell*, 3 Vet.App. at 314; however, when determining whether a severance of service connection was proper, postdecisional evidence is relevant in determining whether the granting of service connection was clearly and unmistakably erroneous, *see Daniels v. Gober*, 10 Vet.App. 474, 480 (1997). Indeed, § 3.105(d) does not limit the reviewable evidence to that which was before the RO in making its initial service connection award and specifically states that "[a] change in diagnosis may be accepted as a basis for severance," which clearly contemplates the consideration of evidence acquired after the original granting of service connection. *See* 38 C.F.R. § 3.105(d). As we recently observed in *Stallworth v. Nicholson*, because the Secretary's burden in a severance proceeding "is not a requirement that he prove clear and unmistakable error in the original decision in the same manner a claimant would show CUE under section 5109A . . . , the Secretary is not limited to the law and the record that existed at the time of the original decision." *Stallworth*, 20 Vet.App. 482, 488 (2006).

The Court's review of a Board decision concerning CUE is limited to deciding whether the Board's conclusion was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 38 U.S.C. § 7261(a)(3)(A); *see Russell*, 3 Vet.App. at 315. As part of that review, however, the Court reviews de novo all questions of law and whether an applicable law or regulation was applied. *See Joyce v. Nicholson*, 19 Vet.App. 36, 42-43 (2005). The Court also reviews whether the Board's decision is supported by an adequate statement of reasons or bases. *See* 38 U.S.C. § 7104(d)(1); *Russell, supra*.

## IV. ANALYSIS

Allen and Key, through counsel, concede that 38 § 3.6(c)(3) (1999 & 2000), was the law extant at the time of the RO decisions awarding VA benefits in this matter; they assert, however, that "[i]t is not undebatable that the decision to grant disability compensation was barred by the provisions of . . . § 3.6(c)(3)," and argue that "there is every reason to believe that the [RO's decisions in May of 1999 and March of 2000 to grant service connection and VA benefits were] a

correct application of the law to the facts as they existed." *Allen* Br. at 8-9; *Key* Br. at 8. As stated above, to establish basic eligibility for veterans benefits based on a period of duty as a member of the Army National Guard of any State, a claimant must show either that he was ordered into Federal service by the President of the United States, *see* 10 U.S.C. § 12401, or that his duty was performed under the provisions of 32 U.S.C. §§ 316, 502, 503, 504, or 505, *see* 38 U.S.C. §§ 101(21), (22)(C), (23). When establishing service in the U.S. Armed Forces, VA is bound by service department findings. *Dacoron v. Brown*, 4 Vet.App. 115, 120 (1993); *see also Duro v. Derwinski*, 2 Vet.App. 530, 532 (1992) ("VA is prohibited from finding, on any basis other than a service department document, which VA believes to be authentic and accurate, or service department verification, that a particular individual served in the U.S. Armed Forces.").

There is no dispute that the RO decisions that awarded Allen and Key VA benefits were rendered without verification of Federal service that would qualify for compensation benefits. After the RO decisions, the Army National Guard issued a letter stating that the "New Mexico National Guard soldiers were activated by the Governor . . . under Title 32, U[.]S[.]C[.,] on state active duty." *Allen* R. at 281; *Key* R. at 89. Here, as the Board found, the Army National Guard verified the NMANG inspector general's observation that Allen and Key were serving on "state active duty" during the New Mexico prison riot. Based on that finding, the Board correctly found that VA had determined that Allen and Key did not have qualifying service for VA benefits purposes because their service during the New Mexico prison riot did "not meet the definition of active duty in the Armed Forces of the United States as specified at 38 C.F.R. § 3.6(c)(3)." *Allen* R. at 6; *Key* R. at 5. The Board further found that the decision to award Allen and Key VA benefits was clearly and unmistakably erroneous "because state service does not qualify as Federal Service." *Id*. Neither Allen nor Key disputes that the Governor's order into active service was for the State of New Mexico. Because Allen and Key were serving the State of New Mexico, and the Army National Guard is only part of the "United States Army" for active-duty purposes "while in the service of the United States," we hold that Allen and Key were not eligible for VA benefits based on any service that can be characterized as active duty under section 101(21)(A). *See* 10 U.S.C. § 12401; 38 U.S.C. § 101(21)(A); 38 C.F.R. § 3.6(b)(1).

Further, Allen and Key argue that they are entitled to veterans benefits on the basis that:

8

"Section 101(24)(B) defines *active military or naval service as* 'any period of active duty [for] training during which the individual concerned was disabled'"; (2) "[section] 101(22)(C) defines *active duty training* to mean 'full-time duty' as a member of the Army National Guard of any state"; and (3) neither section 101(22)(C) nor § 3.6(c)(3) "makes [any] distinction or reference to any difference between 'State duty rather than Federal duty.'" *Allen* Br. at 11-13; *Key* Br. at 10-11. These arguments lack merit. Their definition of "active duty for training" ignores the statutory requirement that "in the case of members of the Army National Guard . . . of any State" the full-time duty must be "under section 316, 502, 503, 504, or 505 of title 32," 38 U.S.C. § 101(22)(C). The implementing regulation similarly defines "[a]ctive duty for training" as "[f]ull-time duty performed by members of the National Guard of any State, under 32 U.S.C. [§§] 316, 502, 503, 504, or 505." 38 C.F.R. § 3.6(c)(3). Indeed, in a preceding section of their briefs, the parties acknowledge that section 101(22)(C) makes "clear that the service must be both 'full time' and 'under 32 U.S.C. etc.'" *Allen* Br. at 10; *Key* Br. at 10. Further, we observe that both 10 U.S.C. § 101 and 32 U.S.C. § 101 define "Full-time National Guard duty" as "training or other duty, other than inactive duty, performed by a member of the Army National Guard *of the United States* . . . ." 10 U.S.C. § 101 (emphasis added); 32 U.S.C. § 101(19) (emphasis added). Accordingly, a National Guardsman is eligible for VA benefits if ordered into Federal service by the President under 10 U.S.C. § 12401 or to perform duty under the provisions of 32 U.S.C. §§ 316, 502, 503, 504, or 505. *See* 38 U.S.C. §§ 101(21), (22)(C), (23).

Here, neither Allen nor Key asserts nor does the evidence reflect that, at the time of the New Mexico prison riot, they were serving on orders pursuant to 32 U.S.C. §§ 316, 502, 503, 504, or 505– the provisions that qualify National Guard duty for VA benefits. *See* 38 C.F.R. § 3.63(c)(3). To the extent they argue that sections 502 and 503 are applicable to their claims, the plain language of those sections does not contemplate quelling a riot in a state prison as active duty. Instead, those sections are concerned only with training. *See* 32 U.S.C. § 502 (noting that members of the National Guard are required to "assemble for drill and instruction, including indoor target practice, at least 48 times each year" and "participate in training at encampments, maneuvers, outdoor target practice, or other exercises, at least 15 days each year"); 32 U.S.C. § 503 (stating that National Guard may be ordered to participate in "encampments, maneuvers, outdoor target practice, or other exercises for field or

coast-defense instruction"); *see also Brown v. Gardner*, 513 U.S. 115, 120 (1994) (stating that, if meaning of statute is clear from its language, then that is "the end of the matter").

Further, although the 2001 VA C&P advisory opinion did not discuss specifically those sections of title 32, it relied on the Army National Guard determination that the NMANG service at the time of the prison riot was not "active duty." Thus, VA determined that Allen and Key were not performing duty under the required section of title 32 that would recognize them as serving within the Armed Forces of the United States. Likewise, the plain language of the other abovementioned sections of title 32 would not encompass this type of state participation. *See* 32 U.S.C. §§ 316, 504, 505. Accordingly, there is no authority under which VA could continue service-connected disability compensation payments to Allen and Key for their NMANG service during the Santa Fe, New Mexico, prison riot. *See* 38 U.S.C. §§ 101(22)(C), (24)(b), 1131. Indeed, under the New Mexico Annotated Code, "[t]he [G]overnor may, in case of insurrection, invasion, riot or breach of the peace or of imminent danger thereof or in case of other emergency, order into *active service of the state* the militia or any components or parts thereof *that have not been called into federal service*." N.M. STAT. ANN. § 20-2-3 (2007) (emphasis added). Thus, under the plain language of § 20-2-3, the Governor may only order into active service of the State those Guardsmen that have not been called into Federal service. The evidence before the Board established that Allen and Key have no legal entitlement to VA service connection and, therefore, the provisions of § 3.105(a) and (d), which limit VA's ability to sever service connection, do not apply. *See Venturella, supra* (holding that where "evidence establishes that there is no legal entitlement to service connection, the provisions of 38 C.F.R. § 3.105(a) and (d) . . . do not apply, and the payment of [VA] benefits . . . must be discontinued").

Because Allen and Key's NMANG service during the New Mexico prison riot does not constitute active duty under § 3.6(c)(3), VA benefits are not warranted as a matter of law. *See Sabonis v. Brown*, 6 Vet.App. 426, 430 (1994) (holding that where law and not evidence is dispositive, claim should be denied or appeal terminated because of lack of legal merit or lack of entitlement under the law); *see also Valiao v. Principi*, 17 Vet.App. 229, 232 (2003) (holding that "[w]here the facts averred by a claimant cannot conceivably result in any disposition of the appeal other than affirmance of the Board decision, the case should not be remanded for development that

10

could not possibly change the outcome of the decision"). Therefore, because it was "clearly illegal" to award service connection under these circumstances, the Board did not have to determine whether CUE had been committed in the May 1999 and March 2000 RO decisions. 38 C.F.R. § 3.105. Any error in the Board's conclusions in its January and April 2004 decisions that the RO had committed CUE in May 1999 and March 2000 was harmless error. *See* 38 U.S.C. § 7261(b)(2) (providing that Court shall take due account of rule of prejudicial error); *see Conway v. Principi*, 353 F.3d 1369, 1375 (Fed. Cir. 2004); *see also Beverly v. Nicholson*, 19 Vet.App. 394, 402-03 (2006) (holding Board error nonprejudicial because there was no legal basis upon which claimant could prevail); *Venturella, supra* (Board's determination of well-groundedness is harmless error where claimant could not prevail as a matter of law based upon lack of legal entitlement to service). Further, even assuming, as the parties contend, that the Board failed to provide an adequate statement of reasons or bases for its determination that the RO's severance of service connection was proper, that error too is nonprejudicial. *See* 38 U.S.C. §§ 7104(d)(1), 7261(b)(2); *see also NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969) (stating that judicial review of agency's action should not be converted into a "ping-pong game" where remand is "an idle and useless formality"); *Soyini v. Derwinski*, 1 Vet.App. 540, 546 (1991) (concluding that where evidence is overwhelmingly against the claim, remand for reasons-or-bases deficiency would be superfluous).

Alternatively, even if the provisions of § 3.105(d) applied in this matter, Allen and Key could not prevail. As noted above, § 3.105 provides that for CUE to exist either (1) the correct facts in, or constructively in, the record were not before the adjudicator or (2) the statutory or regulatory provisions extant at the time were incorrectly applied. *See Damrel,* 6 Vet.App. at 245. A decision that is reversed or amended on the basis of CUE "is being revised to conform to the 'true' state of the facts or the law that existed at the time of the original adjudication." *Russell*, 3 Vet.App. at 313. Allen and Key argue that reliance on the 2001 C&P advisory opinion is impermissible because that opinion constitutes "a post hoc *re-weighing* of the facts and does not constitute clear and unmistakable evidence to support . . . VA's burden to sever an award of disability compensation." *Allen* Br. at 8-15; *Key* Br. at 7-15. That argument fails for two reasons. It ignores that the existing law governing entitlement to VA benefits is the same as it was at the time the RO terminated those benefits. Indeed, the 2001 advisory opinion was not a "reweighing" of facts previously known, but

11

rather was a clarification of what the law always was, as applied to the facts as they existed–i.e., that NMANG service pursuant to state order to quell the New Mexico prison riot was not "active duty" for VA benefits purposes.

Further, the advisory opinion demonstrates that the correct facts were not properly before the adjudicator. Indisputably, the RO awarded Allen and Key VA benefits "in the absence of verified Federal service that would qualify for compensation benefits." *Allen* R. at 281; *Key* R. at 89. However, "VA is prohibited from finding, on any basis other than a service department document, which VA believes to be authentic and accurate, or service department verification, that a particular individual served in the U.S. Armed Forces." *Cahall v. Brown*, 7 Vet.App. 232, 237 (1994). There was no authority for the RO to award Allen and Key VA benefits in the absence of verified service in the U.S. Armed Forces. *See OPM v. Richmond*, 496 U.S. 414, 416 (1990) (holding that "payments of money from the Federal Treasury are limited to those authorized by statute"); *Harvey v. Brown*, 6 Vet.App. 416, 424 (1994) (denying entitlement to statutorily prescribed benefits because claimant did not meet the statutory eligibility criteria established by Congress). Army National Guard records determined that Allen and Key did not have qualifying Federal service at the time the RO awarded them service connection. This is not a "new" fact, but rather, reflective of the "true" state of the facts at the time of the underlying RO decisions. *See Russell, supra*. Accordingly, as determined above, had the RO not erred by failing to verify whether the service of Allen and Key in the NMANG during the New Mexico prison riot was "Federal service," the outcome of the decision would have been manifestly different–i.e, service connection would have been denied based on a finding on nonqualifying service. *See* 38 U.S.C. §§ 101(21), (22)(C), (23), (24), 1131; 38 C.F.R. §§ 3.6(a), (b)(1), (c)(3), 3.303; *see also* 10 U.S.C. §§ 10106, 10107; 32 U.S.C. §§ 316, 502, 503, 504, 505.

## V. CONCLUSION

After considering the briefs and a review of the record, we conclude that neither Allen nor Key have demonstrated that the Board committed legal or factual error that would warrant reversal or remand. Accordingly, the January 29, 2004, and April 26, 2004, Board decisions are AFFIRMED. *See* 38 U.S.C. § 7252(a).

12